IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON  DIVISION


JENNIFER WORKMAN, et al.,

                    Plaintiffs,

v.                                       CIVIL ACTION NO.  2:09-cv-00325

MINGO COUNTY SCHOOLS, et al.,

                    Defendants.


**MEMORANDUM OPINION & ORDER**

      Pending before the court are the plaintiff Jennifer Workman's Motion for Summary Judgment [Docket 62], defendants Mingo County Board of Education and Dr. Steven L. Paine's Motion for Summary Judgment [Docket 98], and defendant Dwight Dials' Motion for Summary Judgment [Docket 102].  For the reasons explained below, the plaintiff's Motion is **DENIED,** and the defendants' Motions are **GRANTED**.  All other pending motions [Dockets 2, 73, 97, 118] are **DENIED** as moot.

**I.**      **Background**

      The case concerns the legality of West Virginia's mandatory immunization program for schoolchildren.  This topic is a sensitive one.  An increasing number of parents across the country question the safety of vaccinations—particularly the purported relationship between vaccinations and autism.  *See, e.g.,* Alice Park, *How Safe Are Vaccines?*, TIME, May 21, 2008, *available at* http://www.time.com/time/health/article/0,8599,1808438,00.html.   A parent's concern for her children's health and well-being is understandable.  However, little evidence supports the claim that

standard vaccinations are unsafe, *see id.*, and the plaintiff does not contest the safety and efficacy of vaccines in this case.  (*See* Pl.'s Mem. Supp. Mot. Preclude Med. Test. & Evidence 1 (arguing that "medical issues are irrelevant") [Docket 119].)  Others oppose vaccinations on religious or philosophical grounds.  Currently, West Virginia is one of only two states that do not permit a religious exemption from mandatory vaccinations.

Jennifer Workman brings this suit individually and as the parent and guardian of her minor child, M.W.[1]  Ms. Workman is the mother of two school-aged children:  M.W., age six, and S.W., age thirteen.  S.W. suffers from serious health problems, which manifested around the time she began receiving vaccinations.  (Compl., Ex. 1 ¶ 4 [Docket 1].)  Specifically, S.W. has been diagnosed with pervasive developmental disorder, not otherwise specified, severe sleep disorders and other behavioral problems.[2]  (*Id.* ¶ 5.)  These health issues have caused behavioral problems that require that S.W. be home-schooled.  (*Id.* ¶ 6.)  In light of S.W.'s health issues, Ms. Workman has chosen not to vaccinate M.W.  (*Id.* at ¶ 7.)

For the purpose of enrolling M.W. in the Mingo County school system without the required immunizations, pursuant to West Virginia Code section 16-3-4,[3] Ms. Workman obtained a

---

[1]  For the sake of simplicity, this Order refers to "the plaintiff" in the singular, as do many of the pleadings.

[2]  Pervasive developmental disorder, not otherwise specified, describes "cases where there is marked impairment of social interaction, communication, and/or stereotyped behavior patterns or interest, but when full features for autism or another explicitly defined PDD are not met."  Yale School of Medicine, Yale Child Study Center, Autism, Pervasive Developmental Disorder-Not Otherwise Specified (PDD-NOS), *available at* http://www.med.yale.edu/chldstdy /autism/pddnos.html (last visited on October 26, 2009).

[3]  Section 16-3-4 provides that, although immunizations against diphtheria, polio, rubeola, rubella, tetanus, and whooping cough are compulsory for children entering school for the first time in this state, a non-immunized child may attend school if he or she "produces a certificate from a reputable physician showing that an immunization for [those diseases] has been done or is

Permanent Medical Exemption ("the certificate") for M.W. from Dr. John MacCallum, M.D., a child

psychiatrist.[4]  Dr. MacCallum recommended against vaccinating M.W. due to S.W.'s condition.

(Pl.'s Application, Ex. A.)  Mingo County Health Officer, Dr. Manolo Tampoya, M.D., approved

the certificate and indicated that it satisfied the requirements for M.W. to attend school in Mingo

County, West Virginia.[5]  M.W. subsequently attended the pre-kindergarten program at Lenore K-8

School in Lenore, West Virginia, for approximately one month in the fall of 2007.  (Compl., Ex. 1

¶ 10.)

On September 21, 2007, the Superintendent of Mingo County Schools, defendant Dwight

Dials, sent a letter to Dr. Cathy Slemp, the Acting Head of the West Virginia Department of Health

and Human Resources, noting that a school nurse had challenged the plaintiff's certificate.  His letter

reads, in relevant part:

---

impossible or improper or other sufficient reason why such immunizations have not been done."
W. Va. Code § 16-3-4.

[4]  My best efforts at interpreting the handwritten note from Dr. MacCallum are as
follows:

> I have examined [M.W.], age 7, and I have also examined her sister [S.W.], age
> 11—who is clearly autistic and likely because her (unintelligible) at age 2.
> Because of the sister's problems, it is likely that Madison's immune response
> would parallel those of her sister.  I therefore recommend that she NOT be given
> <u>ANY</u> vaccines.  She also has speech/language delays, (unintelligible) future
> concern (unintelligible) vaccines.

(Pl.'s Application [Docket 2], Ex. A (emphasis in original).)

[5]  Dr. Tampoya's handwritten memorandum, dated September 11, 2007, reads:

> According to State Code 16-3-4 a certificate is present from a reputable physician
> and I have viewed this certificate.  I accept the certificate from the reputable
> physician for this child to attend school in Mingo Co.

(Pl.'s Application, Ex. C.)

3

> We have concerns about [the decision to allow M.W. to attend school] due to the precedence [sic] it will set for our county and possibly for the state. We feel it would be remiss to not have our concerns clarified for future reference and decision making in similar matters. The county has been consistent in all approaches and decisions concerning immunizations and this situation is new to our county.
>
> All protocols have been completed in Mingo Co. concerning this and we would appreciate your thoughts on this issue.

(Dep't Health & Human Res. Opp'n Pl.'s Application & Mot. Dismiss [Docket 10], Ex. A.)

Dr. Slemp responded to Mr. Dials by letter dated October 3, 2007, in which she recommended denying the certificate and, therefore, the plaintiff's application for an exemption from the compulsory immunizations. (Pl.'s Application, Ex. B.) Dr. Slemp noted that Dr. MacCallum apparently issued the certificate based on the fact that S.W. had been diagnosed with autism and because M.W. herself has speech and language delays. (*Id.*) Dr. Slemp explained:

> In accordance with current recommendations on immunization practice issued by the American Academy of Pediatrics, American Academy of Family Physicians, and the Advisory Committee for Immunization Practices, autism in a family member is not a contraindication to administration of any of the immunizations required under WV Code Chapter 16-3-4 (school entry immunizations). In addition, speech and language delays, in and of themselves, are not defined contraindications to any of these vaccines.
>
> To be as fair and consistent as possible in evaluating medical exemptions and most important, to assure our evaluations are based on current standards of medical practice and the preponderance of current scientific knowledge, it is the guidance of these organizations that the West Virginia Bureau for Public Health regularly utilizes in evaluating the sufficiency of medical exemption requests.

(*Id.*) Dr. Slemp concluded: "[E]xamining the facts presented in light of current medical guidance on immunization practices, I recommend that this request for medical exemption be denied, assuming immunization requirements apply to the situation at hand. I make this recommendation

considering both the safety of this child and other children in the school setting." (*Id.*) She left "to [Mr. Dials] and the Department of Education [to determine] the applicability of this information to the specific preschool setting involved, based on applicable Department of Education and other laws and regulations." (*Id.*)

Subsequently, on October 10, 2007, Mingo County school nurse Sandy Chapman emailed Rebecca King, the West Virginia Department of Education School Health Services Coordinator, asking for guidance on how to proceed. (Def. Dwight Dials' Memo. Opp'n Pls.' Mot. Summ. J. & Supp. Dwight Dials' Mot. Summ. J. ("Dials Memo") [Docket 103], Ex. 1.) Ms. King responded by email on October 11, 2007, advising that the Workmans be notified "of the need for compliance with [Pre-k] immunizations" and that M.W. be removed from public school at the end of the day on October 12. (*Id.*) Rita Ward, the Mingo County Pre-k Contact, sent the Workmans a letter on October 12, 2007, and carbon copied Sabrina Runyon, the Lenore Pre-k Principal. In her letter, Ms. Ward informed the Workmans about Dr. Slemp's recommendation to Mr. Dials. (Pl.'s Application, Ex. D.) She further stated: "Also, Mingo County Schools was informed to disseminate the information to you and our preschool program at Lenore. Therefore, as of October 12, 2007, [M.W.] will no longer be attending the Preschool Head Start Program at Lenore Pre-k-8 School in Mingo County." (*Id.*)

M.W. did not attend school again until 2008, when she was admitted into a Head Start Program in Lenore which accepted Dr. MacCallum's certificate. (Resp. Opp'n Defs. Mingo County Bd. Educ. & Dr. Steven L. Paine Pl.'s Mot. Summ. J. ("Mingo Defs.' Resp.") [Docket 100], Ex. B at 26.) M.W. is now too old to attend that program, and Mingo County schools will not admit her. (Compl., Ex. 1 ¶¶ 13-14.) Ms. Workman alleges that M.W. was home-schooled as a result. (*Id.* ¶

14.)[6]

Ms. Workman filed this action on April 1, 2009, against Mingo County Schools, Dwight Dials, and the State of West Virginia Department of Health and Human Resources.[7] She raises both constitutional and statutory claims, and seeks declaratory judgment, injunctive relief, and money damages. She alleges that the defendants' denial of M.W.'s application for a medical exemption violates her First, Fifth and Fourteenth Amendment rights—that is, her free exercise rights and rights to due process and equal protection of the laws. Specifically, she states that her Christian Bapticostal religious beliefs require that she honor God by protecting her child from harm and illness, and that immunizing M.W. in this instance would violate those sincerely held beliefs. (Am. Compl. ¶¶ 7, 23 [Docket 38].) She further argues that the defendants' denial of M.W.'s application for medical exemption was "arbitrary, capricious, and unreasonable," and discriminates against her and her family for no valid reason, and thus denies them procedural due process, substantive due process parenting rights, and equal protection of law. (Pl.'s Mem. Supp. Mot. Preclude Med. Test. & Evidence 5.) With regards to her statutory claims, Ms. Workman argues that the defendants violated West Virginia Code section 16-3-4 by refusing to accept Dr. MacCallum's certificate.

---

[6] It appears, however, that after considering home schooling, Ms. Workman decided to enroll M.W. in Kentucky public schools, which accepted her claim of religious exemption from vaccination requirements. (Mingo Defs.' Resp., Ex. B at 45.)

[7] On May 11, 2009, this court granted the plaintiff's Motion to Amend Complaint [Docket 37]. The Amended Complaint clarified that the proper names of the defendants are Mingo County Board of Education and the West Virginia Department of Health and Human Resources, and added Dr. Steven L. Paine [Docket 38]. On June 5, 2009, I dismissed the Department of Health and Human Resources on Eleventh Amendment grounds [Docket 52].

## II.     Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 364-65 (4th Cir. 1985), *abrogated on other grounds*, 490 U.S. 228 (1989).

III.    **Analysis**

A.  *Eleventh Amendment Immunity*

The Eleventh Amendment provides:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  This amendment precludes suits by a citizen of a state against that state.  *Hans v. Louisiana*, 134 U.S. 1 (1890).  It also precludes naming an arm of the state as a defendant.  *See, e.g.*, *Westinghouse Elec. Corp. v. W. Va. Dep't of Highways*, 845 F.2d 468, 469 (4th Cir. 1988) ("[A] claim against the West Virginia Department of Highways is, for eleventh amendment purposes, properly considered one against the state itself.").  As explained in this court's May 27, 2009 Order granting the Motion to Dismiss by the Department of Health and Human Resources, "[a]gencies of the state are arms of the state and therefore, the Eleventh Amendment bars suits against them." (Ord. at 5 [Docket 52].)  However, counties are not arms of the state and thus do not fall within the ambit of the Eleventh Amendment.  *Cf. N. Ins. Co. of N. Y. v. Chatham County, Ga.*, 547 U.S. 189, 193 (2006) ("[T]his Court has repeatedly refused to extend sovereign immunity to counties.").

1.  *Mingo County Board of Education*

Whether the Eleventh Amendment bars the plaintiff's claims against the Mingo County Board of Education (the "Mingo Board") turns on whether the Mingo Board is a county or state entity and thus whether it is an arm of the state.  State boards of educations are widely recognized as entitled to Eleventh Amendment protection.  *See, e.g., Cullens v. Bemis*, 1992 WL 337688, *1 (6th Cir. Nov. 18, 1992) (noting that the Michigan Department of Education is "absolutely immune under the Eleventh Amendment"); *see also* John W. Borkowki & Alexander E. Dreier, *The 1996-97*

*Term of the United States Supreme Court and Its Impact on Public Schools*, 122 Ed. Law Rep. 361, 377 (1998) (noting that "[u]nder the Eleventh Amendment, subject to some exceptions . . . state boards of education [] cannot be sued in federal court without the express consent of the state").

Generally speaking, county boards of education in West Virginia are probably not entitled to Eleventh Amendment protection.[8]  Importantly, however, the West Virginia Board of Education (the "State Board") has intervened in the operations of the Mingo County school system.  Minutes, Special Meeting of the West Virginia Board of Education (Feb. 15, 2005), *available at* http://wvde.state.wv.us/boe-minutes/2005/wvbeminutes021505.html.  This action, taken pursuant to West Virginia Code section 18-2e-5(p)(4)(C), significantly limited the power of the Mingo Board and delegated authority to the state superintendent.  This intervention may have rendered the Mingo Board an arm of the state.  *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 123-24 & n.34 (1984) (recognizing that Eleventh Amendment protection can extend to arms of local government when the state is extensively involved in the locality's action so that relief, in essence, runs against the state).

---

[8]  While *Burkey v. Marshall County Board of Education*, 513 F. Supp. 1084, 1095 (N.D. W. Va. 1981), held that West Virginia county boards of education are entitled to Eleventh Amendment protection, *Burkey* does not resolve this issue, as its conclusion on this point was based on a state court decision, *Boggs v. Bd. of Educ. of Clay County*, 244 S.E.2d 799 (W. Va. 1978), that was later overruled, *Ohio Valley Contractors v. Bd. of Educ. of Wetzel County*, 293 S.E.2d 437, 438 (W. Va. 1982).  *Boggs* held that a county board of education was entitled to assert the sovereign immunity provided in the West Virginia Constitution's article VI, section 35, which states: "The State of West Virginia shall never be made defendant in any court of law or equity."  *Boggs*, 244 S.E.2d at 805.  *Ohio* then held that county boards of education are entitled to neither state constitutional immunity nor common law governmental immunity.  293 S.E.2d at 440-42.  Since then, the state legislature has codified immunity provisions for state employees and "political subdivisions," including county boards of education.  *See, e.g.,* W. Va. Code. §§ 29-12A-1, 29-12A-3.  Although the analysis and conclusions are context-specific, "[m]ost courts to address the issue of whether a school district is a state entity have found that it is not."  *Eldeco, Inc. v. Skanska USA Bldg., Inc.*, 447 F. Supp. 2d 521, 524 (D.S.C. 2006) (citing decisions from various jurisdictions).

The Fourth Circuit has enumerated a list of factors to determine whether an entity is an arm of the state.  *Cash v. Granville County Bd. of Educ.*, 242 F.3d 219 (4th Cir. 2001).  While emphasizing that the most important factor "is whether a judgment against the governmental entity would have to be paid from the State's treasury,"[9] this factor is not necessarily dispositive:

> To examine the nature of the entity and its relationship with the State, we keep the State treasury factor in the calculus and look to three additional factors: (1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys; (2) the scope of the entity's concerns—whether local or statewide—with which the entity is involved; and (3) the manner in which State law treats the entity.  Under this "sovereign dignity" inquiry, a court must, in the end, determine whether the governmental entity is so connected to the State that the legal action against the entity would . . . amount to "the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties."

*Id.* at 223-24 (internal citations omitted).

The State Board effectively has total control over the Mingo County school system.  The takeover was conducted pursuant to West Virginia Code section 18-2E-5(p)(4)(C), which provides:

> Whenever nonapproval status is given to a school system, the state board shall declare a state of emergency in the school system . . . If progress in correcting the emergency, as determined by the state board, is not made within six months . . . the state board shall intervene in the operation of the school system to cause improvements to be made that will provide assurances that a thorough and efficient system of schools will be provided. This intervention may include, but is not limited to, the following:
>
> (i) Limiting the authority of the county superintendent and county board as to the expenditure of funds, the employment and dismissal of personnel, the

---

[9] Without citing any authority, Ms. Workman asserts that "Defendant Mingo County Board of Education would likely be responsible for paying its own judgment for damages."  (Pl.'s Resp. Mingo. Defs. 9.)  The defendants counter: "As a matter of law, given the intervention by the State, the State Board is authorized to control the expenditure of funds."  (Repl. Defs. Mingo County. Bd. Educ. & Dr. Steven L. Paine Pl.'s Mem. Resp. Defs.' Mot. Summ. J. ("Repl. Mingo Defs.") 6 (citing W. Va. Code § 18-2E-5(p)(4)(C)) [Docket 112].)

establishment and operation of the school calendar, the establishment of instructional programs and rules and any other areas designated by the state board by rule, which may include delegating decision-making authority regarding these matters to the state superintendent;

(ii) Declaring that the office of the county superintendent is vacant;

(iii) Delegating to the state superintendent both the authority to conduct hearings on personnel matters and school closure or consolidation matters and, subsequently, to render the resulting decisions . . .,

. . . .

(v) Taking any direct action necessary to correct the emergency including, but not limited to, the following:

(I) Delegating to the state superintendent the authority to replace administrators and principals in low performing schools and to transfer them into alternate professional positions within the county at his or her discretion; and

(II) Delegating to the state superintendent the authority to fill positions of administrators and principals with individuals determined by the state superintendent to be the most qualified for the positions. . . .

The powers enumerated in the statute are impressive. Yet the State Board's powers exceed even these, since the statute itself declares that the State Board's intervention need not be limited to the listed powers.

With respect to the first *Cash* factor, the "degree of control that the State exercises over the entity" is immense; the "degree of autonomy from the State that the entity enjoys" is negligible. *Cash*, 242 F.3d at 224. For example, the statute empowers the State Board to "[l]imit the authority of the county superintendent and county board" in "any . . . area[] designated by the [S]tate [B]oard." W. Va. Code § 18-2E-5(p)(4)(C)(i). The second *Cash* factor, "the scope of the entity's concerns," is arguably more ambiguous; while the focus of the Mingo Board remains education in Mingo County, its takeover was conducted pursuant to a "process for improving education . .

. to provide assurances that . . . high quality standards are, at a minimum, being met and that a thorough and efficient system of schools is being provided for all West Virginia public school students." W. Va. Code § 18-2E-5 (a)(4). But the third *Cash* factor strongly suggests that the Mingo Board is an arm of the state. A consideration of "the manner in which State law treats the entity" reveals that the Mingo Board, after the takeover, has little to no rights of autonomy and self-control. Instead, the State Board is empowered to manage the schools in Mingo County and accordingly control the Mingo Board. State law subjects the Mingo Board to the State Board's authority in seemingly all spheres.

The State Board is an arm of the state of West Virginia and protected under the Eleventh Amendment. Because the State Board now effectively controls the Mingo Board, the plaintiff's claims against the Mingo Board are constitutionally barred. The Mingo Board's Motion for Summary Judgment is **GRANTED**.

### 2. *Dr. Steven L. Paine and Dwight Dials*

While a plaintiff may not sue agencies of the state that are protected by the Eleventh Amendment, she may still pursue damages claims against individual state officers by suing them in their personal capacities. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). Personal-capacity suits "seek to impose individual liability upon a government officer for actions taken under color of state law." *Id.* at 25. Moreover, plaintiffs may generally seek prospective injunctive relief from state officers under a judicially recognized exception to the Eleventh Amendment. *Quern v. Jordan*, 440 U.S. 332, 346-49 (1979); *Edelman v. Jordan*, 415 U.S. 651, 665-69 (1974); *Ex parte Young*, 209 U.S. 123, 159-60 (1908). Federal courts nevertheless lack jurisdiction to enjoin state officers from violating state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)

(concluding that "*Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law," noting "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law").

Dr. Paine, the State Superintendent of Schools, is a state officer.   Dwight Dials, Superintendent of Mingo County Schools, was hired by Dr. Steven L. Paine to manage Mingo County schools.  (*See* Dials Memo, Ex. 3 (employment contract of Dwight Dials).)  Local officers, depending on the particular circumstances, may be entitled to Eleventh Amendment protection as agents of the state.  *Cf. McMillian v. Monroe County, Al.*, 520 U.S. 781 (1997) (holding that for purposes of applying 42 U.S.C. § 1983, Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama rather than their counties).  Although Mr. Dials occupies the position of a county officer, he was hired by a state officer, to enact state policy.  Thus, he is an agent of the state and  also entitled to the same Eleventh Amendment protections as Dr. Paine.

Ms. Workman  may pursue her claims for damages against the individual defendants only by suing them in their personal capacities.  In response to the argument that she seeks relief against Dr. Paine in his official rather than personal capacity, the plaintiff states, "Dr. Paine is named as a defendant in this lawsuit primarily to compel him to require the Mingo County Board of Education and Superintendent Dwight Dials either to accept the medical vaccine exemption or to abstain from applying the West Virginia Statute requiring vaccines to Plaintiffs."  (Pl.'s Resp. Mingo. Defs. 10.) *Hafer* counsels that the terminology referring to official-capacity and personal-capacity suits "is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury."  502 U.S. at 26.  At least ostensibly, Ms. Workman has sued Dr. Paine in his personal capacity.  I also accept that Ms. Workman has sued Dwight Dials in his

13

personal capacity.  Thus, Ms. Workman's claims against Dr. Paine and Mr. Dials for damages, *Hafer*, 502 U.S. at 31, and for prospective injunctive relief of her federal claims, *Ex parte Young*, 209 U.S. at 159-60, survive Eleventh Amendment analysis.  As such, I must address the merits of her claims.

### B.  *Constitutional Claims*

The plaintiff alleges that the defendants' actions violate her freedom of religion, due process, and equal protection rights.  As explained below, these claims lack merit.  Thus, summary judgment is **GRANTED** for the defendants on the plaintiff's constitutional claims.

#### 1.  *Freedom of Religion Claim*

The plaintiff argues that West Virginia's mandatory immunization program violates her freedom of religion.  West Virginia, unlike most states, does not have a religious exemption to its immunization requirements for schoolchildren.  Ms. Workman contends that her sincere religious beliefs prohibit her from having M.W. vaccinated.[10]  She asserts that "[t]he U.S. Constitution guarantees the free exercise of religion. This allows parents as of right to opt their children out of vaccines, should they go against their genuine, sincerely-held religious beliefs." (Pl.'s Mot. Summ J. ¶ 3.)

Ms. Workman's freedom of religion claim fails.  Her beliefs do not exempt her from complying with West Virginia's mandatory immunization program.  It has long been recognized that local authorities may constitutionally mandate vaccinations. *Jacobson v. Massachusetts*, 197 U.S.

---

[10]  The parties contest whether Ms. Workman's beliefs regarding vaccination are religious.  Since it is not necessary for me to resolve this issue, I decline the opportunity to evaluate the nature of Ms. Workman's beliefs.

14

11, 26 (1905) (affirming guilty judgment in prosecution under state compulsory vaccination law, noting that "[r]eal liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own . . . regardless of the injury that may be done to others").  Furthermore, a parent "cannot claim freedom from compulsory vaccination for [his] child more than for himself on religious grounds."  *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944); *see also id.* at 166-67 ("The right to practice religion freely does not include [parental] liberty to expose the community or the child to communicable disease . . . .").

Although most states have chosen to provide a religious exemption from compulsory immunization, a state need not do so.  *Sherr v. Northport-East Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 88 (E.D.N.Y. 1987) ("[I]t has been settled law for many years that claims of religious freedom must give way [to] the compelling interest of society in fighting . . . contagious diseases through mandatory inoculation programs. . . . The legislature's creation of a statutory exception . . . goes beyond what the Supreme Court has declared the First Amendment [] require[s] . . . ."); *Davis v. State*, 451 A.2d 107, 112 (Md. 1982) (noting that a state need not "provide a religious exemption from its immunization program" (citing *Prince*, 321 U.S. 158)); *Wright v. DeWitt Sch. Dist. No. 1*, 385 S.W.2d 644, 648 (Ark. 1965) (finding that smallpox vaccination requirement does not violate free exercise of religion, because individuals' "freedom to act according to their religious beliefs is subject to a reasonable regulation for the benefit of society as a whole"); *Bd. of Ed. of Mountain Lakes v. Maas*, 152 A.2d 394, 405-06 (N.J. Super. Ct. App. Div. 1959) (upholding compulsory vaccination requirement, noting "'the constitutional guaranty of religious freedom was not intended to prohibit legislation with respect to the general public welfare'" (quoting *Sadlock v. Bd. of Ed. of Borough of Carlstadt*, 58 A.2d 218, 222 (N.J. 1948))); *see also Baer v. City of Bend*,

292 P.2d 134 (Or. 1956) (city fluoridation ordinance does not violate religious liberty); *State ex rel. Holcomb v. Armstrong*, 239 P.2d 545 (Wash. 1952) (mandatory x-ray examination to detect tuberculosis does not violate students' religious freedom rights); *Rice v. Commonwealth*, 49 S.E.2d 342, 347 (Va. 1948) ("The individual cannot be permitted, on religious grounds, to be the judge of his duty to obey the regulatory laws enacted by the State in the interests of the public welfare."); Steve P. Calandrillo, *Vanishing Vaccinations:  Why Are So Many Americans Opting Out of Vaccinating Their Children?*, 37 U. Mich. J.L. Reform 353, 358 n.20 (2004) ("[N]o case . . . holds that [religious] exemptions [to vaccination requirements] must be provided by states.").

West Virginia's mandatory immunization program does not violate Ms. Workman's free exercise rights.  Therefore, summary judgment is **GRANTED** to the defendants on Ms. Workman's First Amendment claims.

### 2.  *Equal Protection and Due Process Claims*

Ms. Workman argues that her equal protection rights were violated because the "[d]efendants' purported denial of the valid exemption was arbitrary, capricious, and unreasonable." (Pl.'s Reply Resp. Opp'n  Defs. Mingo County Bd. Educ. & Dr. Steven L. Paine Mot. Summ. J. ("Pl.'s Reply Mingo Defs.") 14 [Docket 109].)  She also seems to argue that the defendants violated her equal protection rights by not allowing her to simultaneously enroll her children in school and follow her religious beliefs, while parents with different or no religious beliefs may conceivably do so.  (*Id.* at 16.)  Furthermore, she asserts that the procedures used by the defendants violate her procedural due process rights, and that the denial of M.W.'s application for exemption violates her substantive due process rights.  Ms. Workman's equal protection claims and due process claims fail.

There are two aspects of Ms. Workman's equal protection claim:  an as-applied challenge

16

and a facial challenge to the mandatory immunization program.  With regards to her as-applied challenge, the plaintiff argues that the school system discriminated against her and her family.  But she presents no evidence of unequal treatment resulting from intentional or purposeful discrimination to support her claim; instead, all of the evidence is to the contrary.

Defendant Dwight D. Dials has submitted an affidavit from Acting State Health Officer Catherine C. Slemp stating:

> I have never granted a medical exemption from the state immunization laws based on the reason being that the subject child or a relative has autism, or based on a posited connection between autism and vaccines, because neither reason is a recognized medical contraindication to these vaccines.
>
> I am not aware of any instance in which the [West Virginia Board of Public Health] or any of its prior State Health Officers have ever granted a medical exemption to the immunization requirements applicable to school students based on a child or relative having autism, or based on a posited connection between autism and vaccines.

(Repl. Mem. Supp. Dwight Dials' Mot. Summ. J. ("Dials Repl. Mem.") [Docket 114], Ex. 8 ¶¶ 5-6.) Mr. Dials also submitted an affidavit from himself stating that "[a]t the time of th[e] request [for medical exemption], and to this day, I do not recall having ever met any member of the Workman family" and "I do not recall being informed or otherwise aware of any other issues concerning the Workman children."  (*Id.*, Ex. 7 ¶¶ 4-5.)  Mr. Dials states that the medical exemption request constitutes the sole basis of his knowledge of the Workman family, and was of concern to him because he had never before dealt with a request for medical exemption during his tenure as Superintendent, and he "wanted to be sure that [he] handled it correctly and responsibly." (*Id.* ¶ 6.) Conversely, Ms. Workman has presented no evidence that she has been treated differently from others with respect to this issue.

Ms. Workman also challenges the mandatory immunization program on its face. The mere fact that a state or municipality mandates vaccinations, however, is not enough to support an equal protection or due process claim. In *Zucht v. King*, 260 U.S. 174 (1922), the plaintiff claimed that city ordinances requiring vaccination for admission to educational institutions violated her Fourteenth Amendment rights of due process and equal protection. Writing for the Court, Justice Brandies noted that *Jacobson* had long ago "settled that it is within the police power of a State to provide for compulsory vaccination." *Id.* at 176; *see also Boone v. Boozman*, 217 F. Supp. 2d 938, 956 (E.D. Ark. 2002) ("[T]he question presented . . . is whether . . the Due Process Clause [protects] a parent's right to refuse to have her child immunized . . . where immunization is a precondition to attending school. The Nation's history, legal traditions, and practices answer with a resounding 'no.'"); *Maas*, 152 A.2d at 404 ("A requirement that a child must be vaccinated and immunized before it can attend the local public schools violates neither due process nor . . . the equal protection clause of the Constitution.").

Ms. Workman also alleges that the administration of the mandatory immunization program violates her procedural due process rights. Assuming M.W.'s application for exemption is entitled to procedural due process protection, three factors determine whether the procedures followed by the state are constitutionally sufficient: the private interest at stake; the risk of erroneous deprivation through the procedures used and the probable value of additional procedures; and the government's interest. *Slade v. Hampton Rds. Reg'l Jail*, 407 F.3d 243, 252 (4th Cir. 2005) (citing *Mathews v. Eldridge*, 424 U.S., 319 335 (1976)).

As explained above, states and localities may constitutionally exclude children from school because of their lack of immunizations, and that is precisely what the defendants did here. West

18

Virginia provides administrative remedies for "[a]ny person adversely affected by the enforcement of [the immunization requirements] desiring a contested case hearing to determine any rights, duties, interests or privileges."  W. Va. C.S.R. § 64-95-10.  A postdeprivation hearing can be sufficient when predeprivation procedures would risk endangering the public health.  *Cf. N. Am. Cold Storage Co v. City of Chicago*, 211 U.S. 306, 315 (1908).  Ms. Workman argues that the administrative remedies, which she declined to utilize, offer her no relief because West Virginia "fails to allow for a religious exemption, making [the immunization program] unconstitutional."  (Pl.'s Reply Mingo Defs. 14.)  But West Virginia is not obligated to provide such an exemption; its mandatory immunization program is consistent with the United States constitution.  Ms. Workman's procedural due process rights were not violated by the defendants' administration of West Virginia's mandatory immunization program.

In sum, Ms. Workman's First Amendment claim, along with her as-applied and facial equal protection claims and her substantive and procedural due process claims, fails.  Summary judgment is thus **GRANTED** to the defendants on the plaintiff's constitutional claims.

C.  *Statutory Claims*

After dismissing all federal claims, this court lacks jurisdiction to hear pendent state law claims for injunctive relief against Dr. Paine and Mr. Dials.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).  Furthermore, although state law damages claims against state government officers in their personal capacities survive *Pennhurst*, *see, e.g.*, *id.* at 110 n.19, 111 n.21, I see no indication that West Virginia Code section 16-3-4 permits a private cause of action for damages against Dr. Paine and Mr. Dials.  Therefore, the defendants' motions for summary judgment on the plaintiff's statutory claims are **GRANTED**.

19

**IV.    Conclusion**

In conclusion, the Mingo Board of Education is completely immune from suit under the Eleventh Amendment.  Although some of the plaintiff's claims seeking relief from the individual defendants survive Eleventh Amendment analysis, these claims fail on the merits.  Therefore, the plaintiff's Motion for Summary Judgment [Docket 62] is **DENIED** and the defendants' Motions for Summary Judgment [Dockets 98 & 102] are **GRANTED**.  All other pending motions [Dockets 2, 73, 97, 118] are **DENIED** as moot.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.  The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:        November 3, 2009

Joseph R. Goodwin, Chief Judge

20